J-S15011-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: MICHAEL LELLOCK, AN ALLEGED INCAPACITATED PERSON | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: MICHAEL LELLOCK, ALLEGED INCAPACITATED PERSON | : : : : : : : | No. 1157 WDA 2019 |

Appeal from the Order Entered July 3, 2019
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s):  27-2019 O.C.

BEFORE:   BENDER, P.J.E., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED JUNE 8, 2020**

Appellant, Michael Lellock, appeals from the orphans' court's July 3, 2019 order deeming him an incapacitated person under the Incapacitated Persons Statute, 20 Pa.C.S. §§ 5501-5555, and appointing Appellee, Distinctive Human Services, Inc. (hereinafter "DHS"), as the permanent plenary guardian of his person and estate.  After careful review, we affirm.

Appellant summarizes the facts of this case, as follows:

> Prior to the initiation of the action before th[e orphans' c]ourt, Appellant was charged in multiple criminal matters in Jefferson County.  Those matters were all of an identity theft nature.  During the course of the prosecution of those matters, the trial court ordered Appellant to be evaluated for competency.
>
> Appellant was evaluated by a psychiatrist.  Said evaluation required Appellant to be sent to Torrance State Hospital for restorative therapy, prior to the completion of the competency evaluation.   Torrance State Hospital ultimately concluded

_____

[*] Former Justice specially assigned to the Superior Court.

Appellant was not restorable and was therefore incompetent to stand trial in his criminal matters. Based on the determination from Torrance, the original psychiatrist concluded Appellant was incompetent to stand trial.

Appellant was later evaluated by a psychologist[, Dustin Bingaman, Psy.D.,] who determined Appellant suffers from dementia-related conditions. [DHS] filed a petition asking the lower court to determine Appellant incapacitated and to appoint [DHS] as guardian of Appellant's person and estate.

During evidentiary hearings, [Dr. Bingaman] testified as to Appellant's mental state and diagnosed conditions. The lower court took judicial notice of the criminal proceedings, including the determinations made by the psychiatrist and Torrance State Hospital. Appellant testified on his own behalf. At the conclusion of the second day of testimony, the [orphans'] court adjudicated Appellant an incapacitated person and appointed [DHS] guardian of his person and estate.

Appellant's Brief at 6-7.

Appellant filed a timely notice of appeal from the orphans' court's order deeming him an incapacitated person and appointing DHS as his guardian. On July 19, 2019, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal within 21 days. On August 19, 2019, Appellant's counsel filed a "Motion for Leave to File 1925 Statement *Nunc Pro Tunc*," claiming that he had not been served with the court's Rule 1925(b) order. The court granted counsel's motion that same day, and directed that Appellant file his Rule 1925(b) statement within five days. Appellant timely complied. On December 13, 2019, the orphans' court filed its Rule 1925(a) opinion. Herein, Appellant states one issue for our

review: "Whether the [orphans' court] erred in adjudicating Appellant an incapacitated person[?]"[1]  Appellant's Brief at 5.

To begin, our Supreme Court has applied the following standard of review to incapacity determinations:

> [T]he Court is bound by the trial judge's findings of fact unless those findings are not based on competent evidence. Conclusions of law, however, are not binding on an appellate court[,] whose duty it is to determine whether there was a proper application of law to fact by the lower court.  ***Lawner v. Engelbach***, … 249 A.2d 295 ([Pa.] 1969).

***In re Peery***, 727 A.2d 539, 540 (Pa. 1999).

Appellant challenges the court's determination that he is an 'incapacitated person' in need of DHS's guardianship over his person and estate.  The statute defines "incapacitated person" as "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety."  20 Pa.C.S. § 5501.  In regard to the court's making a determination of incapacity and appointing a guardian, the statute directs:

> **(a) Determination of incapacity.--**In all cases, the court shall consider and make specific findings of fact concerning:

---

[1] Appellant presents two issues in his Statement of the Questions Involved, but indicates that he is withdrawing his first claim.  **See** Appellant's Brief at 5. Therefore, we do not address that issue further.

(1) The nature of any condition or disability which impairs the individual's capacity to make and communicate decisions.

(2) The extent of the individual's capacity to make and communicate decisions.

(3) The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions and in light of the existence, if any, of advance directives such as durable powers of attorney or trusts.

(4) The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability and the capacity to make and communicate decisions.

(5) The duration of the guardianship.

(6) The court shall prefer limited guardianship.

20 Pa.C.S. § 5512.1(a). The court's incapacity and guardianship determination must be supported by clear and convincing evidence. 20 Pa.C.S. § 5511.

Here, the court held a bifurcated hearing on DHS's petition to deem Appellant incapacitated. At the initial hearing on April 18, 2019, DHS called Dr. Bingaman, who was admitted as an expert in the field of psychology with a specialty in geriatric psychology. N.T. Hearing, 4/18/19, at 9. Dr. Bingaman testified that he conducted a capacity evaluation of Appellant on February 21, 2019. *Id.* at 10. As a result of his evaluation, Dr. Bingaman opined that Appellant's "memory is very poor" and that "the main thing that … really hinders [Appellant is] his delusional thought process." *Id.* at 13. The doctor stated that these issues would cause "a real strain on [Appellant's] making decisions and evaluat[ing] and interpreting information." *Id.*

- 4 -

When asked what Dr. Bingaman found relevant in reaching his diagnosis of Appellant, the doctor detailed the delusions Appellant had exhibited during the evaluation, including that he has "a hundred million dollars in gold bars," and "Al-Qaeda is out to get him." *Id.* at 14, 15. Very concerning to the doctor was Appellant's comment that he did "not want[] to get a felony because he didn't want to lose his right to … carry a firearm" because "he feels like he needs his weapons because … people are coming to get him." *Id.* When the doctor asked Appellant how he would respond if he had an emergency, Appellant told the doctor that "he would not call the police because he doesn't trust them and … he would call God and God would take care of everything." *Id.* at 15. Dr. Bingaman testified that it was very difficult to decipher which of Appellant's thoughts were delusional, and it was clear that Appellant was "not thinking in reality at times." *Id.* at 16.

Based on his evaluation, Dr. Bingaman concurred with the prior diagnosis of a doctor at Torrance State Hospital that Appellant has delusional disorder and unspecified neurocognitive disorder, which essentially is "cognitive trouble[,] specifically in memory." *Id.* The doctor opined that Appellant's delusional disorder and paranoia would "really impair[] his ability to evaluate information effectively" and make decisions regarding his life and finances. *Id.* at 17. Dr. Bingaman testified that he does not believe Appellant "has a general understanding of what his assets are," and he opined that Appellant could be taken advantage of financially, and would likely be making

financial decisions based on money he incorrectly believes he has. *Id.* at 18, 19.

In regard to family support, Dr. Bingaman testified that Appellant told the doctor that he lives alone on his family farm and "he consider[s] his ... living siblings dead" because of family disputes. *Id.* at 33. The doctor testified that, considering Appellant's paranoia and unwillingness to call police in an emergency, he "would be concerned about [Appellant's] living on a rural farm by himself with no family." *Id.* Additionally, Appellant had mentioned having a friend, but indicated to the doctor that he was unwilling to call that friend or his sisters for help. *Id.* at 34. When asked if the assistance of a friend or family member would change the doctor's opinion about whether Appellant needed a guardian, the doctor said no, explaining that he worried Appellant's paranoia might cause him to turn against any person helping him, and he would be left unassisted once again. *Id.*

Ultimately, Dr. Bingaman opined, to a reasonable degree of medical certainty, that Appellant was not "able to make decisions concerning the essential requirements for his physical health and safety[,]" and that he would not be able to appropriately manage his income. *Id.* at 20. Dr. Bingaman also stated that Appellant "presents with a lot of paranoia [that] a lot of people are out to get him, and I would worry that if he starts responding to these delusional thoughts that he could harm somebody." *Id.* at 15. Pertaining to the definition of 'incapacitated person' in the statute, Dr. Bingaman testified:

> [Appellant] struggles with the ability to … effectively evaluate information.  I have serious concerns about him being able to take care of his physical health, [and] personal safety[,] especially in emergencies.  I worry that if he were responding to these delusional thoughts, that would impact the safety of others, and even if his friend was managing his finances, … I would be worried about him living independently on his farm.

*Id.* at 36-37.

DHS next presented the testimony of Ellen Hamilton, the "founder and CEO of [DHS]," which was established to serve as guardian for individuals who are "indigent, … elderly, and/or mentally and physically challenged…." *Id.* at 45-46.  Ms. Hamilton explained that if DHS were appointed as Appellant's guardian, he would be placed into a personal care facility, which would provide "[s]ome supervision, assistance with medications, socialization, activities of daily living, laundry, … meals, interactions, … and medical [assistance.]" *Id.* at 49-50.  DHS would also provide an initial assessment within 90 days, setting forth Appellant's assets, where he was going to be living, his visitation allowances, etc.  *Id.* at 53.  DHS would file additionally an annual report detailing Appellant's financial situation, medical information, "any concerns that [DHS] might have," and whether the guardianship should continue.  *Id.* at 54.  Ms. Hamilton testified that she was aware that Appellant was incarcerated in the county jail at the time of the hearing, because he had pending criminal charges but had been deemed incompetent to stand trial. *Id.* at 64.  She stated that, if the court deemed him incompetent, DHS would "make every effort quickly to get him out of jail" and into a facility.  *Id.*

Also at the April hearing, Appellant presented the testimony of his friend, Kim Musser. Ms. Musser testified that she has known Appellant for approximately five years, and that, while he was incarcerated, she checked on his house, got his mail, and paid his bills. *Id.* at 66-67. According to Ms. Musser, Appellant was able to clearly explain to her how to handle issues that arose with his home and finances. *Id.* at 71. Ms. Musser also testified that, to her knowledge, before Appellant was incarcerated, he was able to independently handle his finances, home, property, and other life responsibilities. *Id.* at 69. She had no concerns about his ability to continue to do so upon his release from prison. *Id.* at 70.

At the close of the hearing on April 18, 2019, the court ordered DHS to serve as Appellant's temporary guardian. *Id.* at 78. It then recessed the hearing and directed that it would reconvene on July 2, 2019. *Id.* at 79.

On that date, Appellant testified. He explained that, if he were not deemed an incapacitated person, he would return to the family farm where he had resided before he was incarcerated, and live there alone. N.T. Hearing, 7/2/19, at 4, 8. Appellant described a typical day living on his farm. *Id.* at 9. He discussed his personal care and hygiene, and how he cooked his own meals, gardened, cared for his property, maintained his farm equipment, and regulated his diabetes and other health conditions. *Id.* at 9-15. Appellant expressed that he could "absolutely" take his required medication, as he had been doing for many years. *Id.* at 20. He explained that if he had a medical

emergency, he would call 911. *Id.* at 21. Appellant also testified that he has his driver's license and a vehicle. *Id.* at 22.

In regard to his finances, Appellant explained that his monthly income from Social Security was electronically deposited into his bank account, and he paid his bills electronically or by telephone. *Id.* at 26. He testified clearly about the bills he pays, including his car payment and insurance, as well as approximately how much he spends on groceries, gasoline, and maintaining his home and property. *Id.* at 27-32.

Appellant was then asked about his statement to Dr. Bingaman that he was in danger because of Al-Qaeda. Appellant proceeded into lengthy testimony about how he was the "beneficiary of a large quantity of gold" and, based on his communication with former CIA agents, he believed that if he attempted to access that gold, he would be in danger from "a large gang of Nigerians…." *Id.* at 43-44. Appellant claimed that his life is in danger and he wears "body armor at … different times…." *Id.* at 44. He testified that he owns approximately 30 firearms and was in the process of acquiring more. *Id.* at 37. He also indicated that he would use his guns to defend himself. *Id.* at 44. Appellant explained that he would eventually acquire the gold, which he claimed was valued at "close to a hundred million dollars." *Id.* at 45, 46.

Appellant also repeatedly indicated that he did not trust the police, and that he has "NRA training" to handle any issues himself. *Id.* at 44, 77. In addition, Appellant claimed that he won a lawsuit against "the State of Ohio"

for ten million dollars. *Id.* at 52. He also stated that he had executed a durable power of attorney naming a friend, Sani Sulley, as his agent. *Id.* at 72. According to Appellant, Ms. Sulley is a retired CIA agent who was shot in Ghana by Al-Quaeda during dealings surrounding the "large quantity of gold" Appellant claimed to have inherited. *Id.* at 43.

Additionally, Appellant testified at length about his professional experience, claiming that he is an aircraft engineer and consultant, and that he works for "the department of defense[,]" the Federal Aviation Administration, and Boeing. *Id.* at 55-56, 57. He explained that he has access to "secret national securities information" and that if he divulges any information "it's punishable by [his] death by firing squad." *Id.* at 58. Appellant testified that because of this, he has "to be very careful about what [he] say[s] to people," which affected his responses in his evaluation with Dr. Bingaman. *Id.* at 59. Appellant explained that the doctor "thought there was something wrong with [Appellant] mentally" because Appellant had to pause and think about what he could reveal to the doctor. *Id.* Appellant claimed that he "made up delusions" and lied when speaking with the doctor, so as not to reveal confidential information. *Id.* Appellant also testified at length about companies he allegedly owns and operates, and certifications and licenses that he possesses. *Id.* at 60-62. However, he did not produce any documentation to support his testimony, claiming that it might have been destroyed when his home "was ravaged by the State Police[,]" who "threw paper everywhere inside [his] business [and his] house." *Id.* at 62.

At the close of the July 2, 2019 hearing, the orphans' court set forth its reasons for deeming Appellant an incapacitated person, stating:

[The Court]: [Appellant], it's my duty as the trial court judge to find facts and to decide what are the true facts. … I have to determine whether you have sufficient capacity to make decisions concerning your health, safety, and financial matters, and the Petitioners [DHS] have indicated you do not.

Now, certainly I'll say it in colloquial terms, you haven't been on the street since August of 2017. When you were last on the street, you were charged with a series of felonies, and those charges kept increasing on you. I shredded all my papers regarding the charges because I looked at the reports of Dr. Martone[2] and Torrance and found that you were incompetent to stand trial, which I'm going to say is a lower standard than incapacity, in my opinion, because to stand trial on specific facts, you have to be able to be aware of what the facts are and to be able to assist your attorney or yourself in asking questions and doing that to professionals.

Well, I believe if I recall Dr. Martone's first report, was, I need to send him to Torrance to do a medical regimen to see if he could be stabilized to aid in his defense. Torrance after several months wrote a report that said, [t]his man cannot be stabilized. Now, because of your age, at some point, the jail was informed. Jefferson County Area Agency on Aging, totally separate from all that, sent Dr. Bingaman out who does their normal evaluations for these type[s] of proceedings, and he told the Area Agency on Aging, [t]his man cannot live on his own and cannot make financial decisions.

So[,] I don't see just the fact of having a friend pay your bills while you're in jail as your last acts. I have anywhere from fifty to three hundred thousand dollars in restitution claims that were the result of troopers believing that you did those, and I think it's all the result -- your testimony is delusional. I mean, I -- I really was waiting to hear it, but I am now confident that no appeals court judge will look at this opinion and say this man is not delusional.

---

[2] Dr. Martone's full name is not in the record before us.

The CIA testimony, the Ghana testimony, the fact there's gold somewhere and a $10 million judgment in Ohio, all untrue, and you believe them. You believe them deep in your heart. You believe some woman, who I think is a fictional character in a TV show, has your power of attorney. … Even if these people exist, it doesn't make your testimony any more credible.

No one has come to the Jefferson County Jail. Boeing is not going to look at you to solve their problems even though you're an aeronautical engineer. From the other cases on which you've asked me to recuse because of those results, I know your education, and I know you have a master's degree. And I know you work all over the world. And when you were younger and you were in front of the [c]ourt, you were doing that and doing that successfully. But I have to look at the charges you got.

I don't believe you could care for yourself, and I believe you need to be in a restrictive facility. And you certainly can't be anywhere near a computer because I believe with the delusional acts you'll have, you'll be getting -- you'll end up getting more criminal charges. And if you['re] on your own, you would also, I believe, put your own money into that and end up in a destitute situation. And I don't think because you believe that, I don't think you can care for your health.

Yes, you -- obviously, you look better than the first hearing. You dyed your hair. You got it cut. You're well-dressed and well-groomed. I think there's more to living than that, and I don't think that you have the capacity to do that on your own.

\*\*\*

Now, [DHS is] going to have the primary guardianship…[.] [W]e've had three Ph.D.'s, one of them psychiatric [*sic*] at Torrance, who would essentially all agree with this if they were called: You're incompetent to live on your own. You're incompetent to make decisions because of the actions you've taken and because of the delusions you're under.

N.T. Hearing, 7/2/19, at 104-08.

Additionally, in its Rule 1925(a) opinion, the court adds the following discussion in support of its decision that Appellant is an incapacitated person:

- 12 -

Respecting [Appellant's] capacity, the hearing transcripts plainly demonstrate that the [c]ourt's adjudication was not in error. [Appellant] was evaluated by three different doctors, all of whom found him to be delusional. The third, who specifically evaluated him for purposes of … this case, opined that [Appellant's] delusions would interfere with his ability to live independently and, more specifically, with his ability to make rational decisions so as not to pose a danger to himself or others. *See* [N.T.] Hearing…, 4/18/[]19…, [at] 9-43. His testimony was credible in and of itself, but was bolstered by [Appellant] himself.

As the transcript reflects, [Appellant's] thinking and responses were flightive [*sic*] from the outset. His attorney, however, was able to keep him on track pretty well and elicit appropriate responses as to his home living situation and daily routines, his monthly bills and expenses and how he handled his financial affairs, and how he would respond to an emergency situation. *See* [N.T. Hearing,] []7/02/[]19…, [at] 4-32. Even then, though, he was deliberately tailoring his answers to reflect what he "knew" his attorney and the [c]ourt "wanted" to hear. *Id.* at 32. Yet he could not maintain his charade for long; his extensive delusions and paranoia were soon brought fully to light, beginning with his assertion that all of the psychiatric professionals who had evaluated him were "trying to do [him] in." *Id.* at 40. Soon to follow was his belief that the police were conspiring against him, *id.* at 41-42, which turned out to be one of the least incredible and delusional things he said throughout the remainder of his testimony. *See id.* at 42-93.

That [Appellant] had been able to live alone and care for himself prior to his incarceration and could still keep track of his financial obligations at the time of hearing were not dispositive factors in this case. As Dr. Bingaman explained, his delusions and paranoia posed a very real risk that he would lose faith in the few people whose assistance he did invite and, guided only by his own anti-social thoughts and ideas, endanger himself and those around him.[1] *See* [N.T. Hearing, 4/18/19, at] 34-47. *See also* [N.T. Hearing, 7/2/19, at] 104-09 (where the [c]ourt verbalized its findings in adjudicating [Appellant] to be incapacitated).

[1] The [c]ourt is not intending to diagnose [Appellant] with anti-social disorder; it uses the term as a shorthand to represent his distrust of the police, the court system, and others, combined with his belief that a variety of powerful

and dangerous people are looking for him and would prefer to see him dead.

Trial Court Opinion (TCO), 12/13/19, at 1-2 (unnumbered).

On appeal, Appellant essentially argues that the orphans' court erred by "disregarding competent testimony as to Appellant's abilities to handle his own affairs." Appellant's Brief at 13. He points to Ms. Musser's testimony that he could "maintain his affairs prior to his incarceration" and that "she assisted Appellant in keeping his bills paid and property maintained while he was incarcerated." *Id.* He stresses that he was able to clearly instruct Ms. Musser how to handle his bills and other issues that arose. *Id.* at 13-14. Appellant claims that, "in [Ms. Musser's] review of his expenses, there was nothing out of the usual that would demonstrate a propensity on his part to waste his money or be taken advantage of." *Id.* at 14.

Appellant also claims that his own testimony demonstrates his ability to care for himself, maintain his property, and handle his own finances. *Id.* According to Appellant, the court focused only "on Appellant's outlandish testimony and criminal matters," and "disregard[ed] Appellant's apparent ability to live independently without endangering himself." *Id.* at 15. He also maintains that the court improperly relied "solely on the testimony of [DHS's] expert and that of the experts from the previous criminal matters[,]" while "disregarding the credible testimony given that demonstrated Appellant's ability to maintain his personal affairs if living independently." *Id.* He asks this Court to "review such testimony and apply appropriate weight to the same...." *Id.*

- 14 -

Our standard of review does not permit us to reweigh the evidence or overturn credibility determinations when they are supported by the record, as the court's are in the present case. It was within the orphans' court's province, as the fact-finder, to accept Dr. Bingaman's expert opinion that Appellant is incapable of caring for himself and handling his finances. This is especially true where Appellant's own confusing and delusional testimony supported the doctor's position. Moreover, the court was free to disregard Appellant's earlier, more coherent testimony about his daily life and ability to handle his affairs when Appellant's testimony subsequently devolved into lengthy discourses concerning matters that seemed to be pure figments of his imagination. In sum, the court's credibility determinations are supported by the record and, therefore, we must accept them.

Appellant also claims that the court erred by "allowing Appellant to be placed in a more restrictive setting than is required for his unique situation." *Id.* at 17. Appellant insists that "he can adequately and safely live on his own farm, without the need of twenty-four seven supervision. The [orphans'] court's fear of computer usage … result[ing] in new criminal matters can be vitiated by a limited guardianship that restricts computer and internet access." *Id.* at 17-18.

However, the court clearly was not solely concerned about Appellant's computer access. It also found that Appellant's prior ability to live alone and handle his finances "were not dispositive factors" in its decision to deem him an incapacitated person. TCO at 1 (unnumbered). Rather, the court was

- 15 -

primarily concerned that Appellant's present delusions and paranoia would make him a danger to himself and/or others, and that those mental health issues render him incapable of adequately caring for himself or handling his finances. As the record supports these determinations, we discern no error in the court's deeming Appellant an incapacitated person and appointing DHS as the permanent plenary guardian of his person and estate.[3]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/2020

_____

[3] We observe, however, that it appears the court failed to inform Appellant of his right to file a petition to modify or terminate the guardianship. *See* 20 Pa.C.S. § 5512.1(h) ("At the conclusion of a proceeding in which the person has been adjudicated incapacitated, the court **shall** assure that the person is informed of his right to appeal and to petition to modify or terminate the guardianship.") (emphasis added). While Appellant has not raised any challenge to this omission, thus waiving it for our review, we point out that he may file a petition to change or end DHS's guardianship if/when he believes that his circumstances have changed.